```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
TANIA GALARZA,                                         :
                                                       :
                          Plaintiff,                   :
                                                       :
              v.                                       :    DECISION & ORDER
                                                       :    21-CV-6958 (WFK) (JRC)
SMILEDIRECTCLUB, LLC, HEALTHCARE                       :
FINANCE DIRECT, LLC, PERIODONTAL                       :
SPECIALISTS, INC., and ERIC GUIRGUIS, D.D.S.,          :
                                                       :
                          Defendants.                  :
------------------------------------------------------------------X
```
**WILLIAM F. KUNTZ, II, United States District Judge:**

Tania Galarza ("Plaintiff") brings this action against SmileDirectClub, LLC ("SDC"), Healthcare Finance Direct, LLC ("HFD"), Periodontal Specialists, Inc. ("PSI"), and Eric Guirguis, D.D.S. (collectively, "Defendants"), alleging they provided negligent dental care, engaged in misleading business practices, and committed various other torts under New York law. *See generally* Compl., ECF No. 1-2. Defendants now move to compel arbitration or, alternatively, to dismiss the Complaint against HFD. For the reasons stated below, Defendants' motion to compel arbitration is GRANTED.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted. Defendant SmileDirectClub, LLC ("SDC") is a company offering dental services, including direct-to-consumer clear dental aligners, through a telehealth platform. Compl. ¶ 10; Skinner Decl. ¶ 3, ECF No. 24-2. Defendant Periodontal Specialists, Inc. ("PSI") is a dentistry practice owned by Defendant Eric Guirguis, D.D.S. Compl. ¶¶ 22–30. Dr. Guirguis is a dentist licensed in Ohio. *Id.* PSI and Dr. Guirguis contracted with SDC to oversee its customers' dental care. Skinner Decl. ¶ 4. Defendant Healthcare Finance Direct ("HFD") is "an independent company that processes customer finance options" for SDC customers. Razo Decl. ¶ 3, ECF No. 24-3.

To become an SDC customer, individuals must create an SDC account and complete the registration process. Skinner Decl. ¶¶ 8–9. Consumers can create an SDC account directly

1

through SDC's website or during an in-person visit to a SmileShop. *Id.* ¶ 9. The final step of registration requires potential customers to agree to SDC's (1) Informed Consent, and (2) Terms & SmilePay Conditions ("T&Cs"). *Id.* ¶ 10. These two agreements are presented on a webpage with an unchecked box next to the statement: "I agree to SmileDirectClub's Informed Consent and Terms & SmilePay Conditions." *Id.* ¶¶ 10, 12. "Informed Consent" and "Terms & SmilePay Conditions" appear as blue, underlined hyperlinks. *Id.* ¶ 14. If a consumer clicks either hyperlink, he or she can access, read, download, and print the full text of the agreements. *Id.* To complete registration, consumers must (1) affirmatively check the box next to the above-quoted statement, and then (2) click "Finish My Account." *Id.* ¶ 15. Potential consumers cannot become SDC customers, or access dental services, without checking this box. *Id.* ¶ 9. The same registration process applies online and in physical stores. *Id.* ¶ 14.

On January 21, 2019, Plaintiff Tania Galarza visited a SmileShop, created an SDC account, and completed the registration process to become an SDC customer. Pl.'s Mem. of Law in Opp'n to Mot. to Compel Arbitration and Dismiss the Compl. ("Pl.'s Opp'n"), Ex. 1 ("Pl.'s Decl.") ¶ 4, ECF No. 26-4; Skinner Decl. ¶¶ 11, 19, 23. While at the SmileShop, Plaintiff agreed to SDC's Informed Consent and T&Cs. Skinner Decl. ¶¶ 26–27; SDC Records, ECF No. 24-2. Plaintiff admits she signed the agreements but claims she did not have sufficient time to review them. Pl.'s Decl. ¶¶ 6, 9, 16; Pl.'s Opp'n at 17, ECF No. 26. Plaintiff asserts the SDC employee assisting her on January 21, 2019, offered to "accelerate the process of [her] signature," preventing Plaintiff from fully reading or comprehending the document. Pl.'s Decl. ¶ 6–7. Plaintiff signed the Informed Consent agreement again at a follow-up visit on June 10, 2019. *See id.* ¶¶ 15–16. Plaintiff claims she signed the agreement again in June 2019 because she "needed treatment" and "was told [she] would not be treated without checking the box." *Id.* ¶ 16.

Version 7 of SDC's Informed Consent agreement contains the following provision:

> AGREEMENT TO ARBITRATE – I hereby agree that any dispute regarding the products and services offered through SmileDirectClub and/or by my affiliated dental professionals, including but not limited to medical malpractice disputes, will be resolved through final and binding arbitration before a neutral arbitrator and not by lawsuit filed in any court, except claims within the jurisdiction of Small Claims Court. I understand that I am waiving any right I might otherwise have to a trial by jury. I understand that to initiate the arbitration, I must send a Demand for Arbitration via U.S. Mail, postage prepaid to Alex Fenkell, SmileDirectClub, LLC, Bank of America Plaza, 414 Union Str., 8th Floor, Nashville, Tennessee 37219. The Demand for Arbitration must be in writing to all parties, identify each defendant, describe the claim against each party, state the amount of damages sought, and include the names of the patient and his/her attorney. I agree that the arbitration shall be conducted by a single, neutral arbitrator selected by the parties and shall be resolved using the rules of the American Arbitration Association.
>
> I further agree that any arbitration under this agreement will take place on an individual basis, that class arbitration and class actions are not permitted, and that I am agreeing to give up the ability to participate in a class action.

Defs.' Mem. of Law in Support of Motion to Compel Arbitration and Dismiss the Compl. ("Defs.' Mem."), Ex. 1, ECF No. 24-2.[1]

After registering as a customer, Plaintiff purchased clear orthodontic aligners from SDC. Compl. ¶ 16. Plaintiff alleges SDC's aligners were ineffective and caused her "continuous significant oral pain." Pl.'s Decl. ¶ 19. Plaintiff claims she called SDC "[f]or over a year . . . to complain of the unbearable pain," but SDC neither "returned [her] calls" nor "offered [her] the chance to speak to Dr. Guirguis." *Id.* While Defendants assert "Dr. Guirguis prescribed and supervised Plaintiff's specific treatment," Defs.' Mem. at 2, Plaintiff claims she never

---

[1] Plaintiff agreed to Version 5 of the Informed Consent on January 21, 2019, and to Version 7 on June 10, 2019. Skinner Decl. ¶ 27. The arbitration clause does not differ between the two versions. *Id.*

3

communicated with Dr. Guirguis or other dentists at PSI. Pl.'s Decl. ¶ 18; Pl.'s Opp'n at 12. Plaintiff also contends SDC used dental assistants—not dentists—to treat her, and she would not have used Defendants' services had she known that would be the case. Newman Decl. ¶ 7, ECF No. 26-1; Pl.'s Decl. ¶ 25.

## II.   PROCEDURAL HISTORY

On September 15, 2021, Plaintiff filed a Complaint against Defendants in the Supreme Court for the State of New York, Kings County. *See generally* Compl. Plaintiff seeks damages for the following claims: (1) dental malpractice; (2) failure to obtain informed consent; (3) negligence in failure to communicate significant findings to Plaintiff; (4) violation of New York General Business Law ("GBL") § 349 (deceptive business acts and practices); (5) violation of New York GBL § 350 (false advertising); (6) breach of contract; (7) products liability, failure to warn; (8) breach of warranty; (9) breach of implied warranty; and (10) products liability, defective design. *Id.*; Pl.'s Opp'n at 10. On December 17, 2021, Defendants removed this case to the United States District Court of Eastern District of New York pursuant to 28 U.S.C. § 1441(a), 1446(b). Notice of Removal, ECF No. 1.

On August 5, 2022, Defendants moved to compel arbitration or, in the alternative, to dismiss the Complaint as to Defendant HFD pursuant to Federal Rule of Civil Procedure 12(b)(6). On November 15, 2024, Plaintiff voluntarily dismissed the Complaint against Defendants SDC and HFD. Stipulation of Voluntary Partial Dismissal, ECF No. 48. As such, Defendants' motion to dismiss the Complaint against HFD is moot. The Court now considers Defendants' motion to compel arbitration as to the remaining Defendants, PSI and Dr. Guirguis.

### III. LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition the district court for an order directing "arbitration [to] proceed in the manner provided for in such agreement." 9 U.S.C. §§ 3, 4; *see also Hernandez v. RNC Indus., LLC*, 21-CV-4518, 2024 WL 964932, at *2 (E.D.N.Y. Mar. 6, 2024) (Seybert, J.) (internal alteration and quotation marks omitted). "[A] district court must stay proceedings if [it is] satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *Ji Dong Cheng v. HSBC Bank USA, N.A.*, 467 F. Supp. 3d 46, 50 (E.D.N.Y. 2020) (quoting *McMahan Secs. Co. L.P. v. Forum Capital Mkts. L.P.*, 35 F.3d 82, 85 (2d Cir. 1994)) (internal quotation marks omitted). Also, "courts have the discretion to dismiss—rather than stay—an action when *all* of the issues in it must be arbitrated." *More Roofing, Inc. v. Scrivens*, 19-CV-4925, 2021 WL 413605, at *1 n.2 (E.D.N.Y. Feb. 5, 2021) (Garaufis, J.) (internal quotation marks and citation omitted) (emphasis in original).

"Courts deciding motions to compel arbitration apply a standard similar to that applicable for a motion for summary judgment." *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833 (2d Cir. 2021) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)) (internal quotation marks omitted). "[J]ust as for motions for summary judgment, a court must 'consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits.'" *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (internal alterations and citation omitted). And "a court must draw all reasonable inferences in favor of the nonmovant." *Id.* at 49 (internal quotation marks and citation omitted).

## IV. DISCUSSION

When evaluating a motion to compel arbitration, courts must determine (1) whether a valid agreement to arbitrate exists, and, if it does, (2) whether such agreement encompasses the dispute at issue. *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011).

### I. There is a Valid Agreement to Arbitrate Plaintiff's Claims.

#### a. Plaintiff Assented to the Terms of the Arbitration Agreement.

"Whether or not the parties have agreed to arbitrate is a question of state contract law." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012). The parties here agree New York law applies in this case. Contracts under New York law require "mutual manifestation of assent, whether by written or spoken word or by conduct." *Sollinger v. SmileDirectClub, LLC*, 19-CV-5977, 2020 WL 774135, at *2 (S.D.N.Y. Feb. 18, 2020) (Oetken, J.) (quoting *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 464 (S.D.N.Y. 2017) (Koeltl, J.)).

"In the context of agreements made over the internet, New York courts find that binding contracts are made when the user takes some action demonstrating that she has at least constructive knowledge of the terms of the agreement, from which knowledge a court can infer acceptance." *Kai Peng v. Uber Techs., Inc.*, 237 F. Supp. 3d 36, 47 (E.D.N.Y. 2017) (Chen, J.) (internal quotation marks and citation omitted). "Courts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (internal quotation marks and citation omitted).

Here, SDC's "Informed Consent" document is presented as a "click-wrap" agreement, which refers to "the assent process by which a user must click 'I agree,' but not necessarily view the contract to which she is assenting." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394–95 (E.D.N.Y. 2015) (Weinstein, J.). "As a general matter, in New York, clickwrap agreements are

valid and enforceable contracts." *Sollinger*, 2020 WL 774135, at *2 (internal alteration and citation omitted). "A party may be bound to a 'click-wrap' agreement . . . by clicking a button declaring assent, so long as the party is given 'a sufficient opportunity to read the . . . agreement, and assents thereto after being provided with an unambiguous method of accepting or declining the offer." *Kai Peng*, 237 F. Supp. 3d at 47 (quoting *Serrano v. Cablevision Sys. Corp.*, 863 F. Supp. 2d 157, 164 (E.D.N.Y. 2012) (Irizarry, J.)).

Here, the Arbitration Agreement is set forth in SDC's Informed Consent. Skinner Decl. ¶¶ 17–18. Plaintiff concedes she agreed to the Informed Consent but alleges she did not have actual knowledge of the Arbitration Agreement. Even crediting Plaintiff's argument that she did not have actual knowledge of the Arbitration Agreement when she signed the Informed Consent, *see supra* Part I, "the validity of the agreement turns on whether the website puts a reasonably prudent user on inquiry notice of the contract," *Sollinger*, 2020 WL 774135, at *2 (internal alterations and citation omitted). A reasonable user is on inquiry notice if he or she "would know that by clicking on the registration button, he [or she] was agreeing to the terms and conditions accessible via the hyperlink, whether he [or she] clicked the hyperlink or not." *Meyer*, 868 F.3d at 79–80.

Plaintiff contends SDC hid the Arbitration Agreement in the Informed Consent, an idea "which is not related to the legal concepts of arbitration or jury trial waiver." Pl.'s Opp'n at 16. But the "location of the arbitration clause" is not "itself a 'barrier to reasonable notice.'" *Meyer*, 868 F.3d at 79 (internal citation omitted). Inquiry notice "turns on the totality of the circumstances." *Sollinger*, 2020 WL 774135, at *2 (internal quotation marks and citation omitted).

7

Here, the totality of the circumstances demonstrates SDC's registration page did put a reasonably prudent user on notice he or she was agreeing to the terms and conditions of the Informed Consent, including the Arbitration Agreement. The hyperlink to the Informed Consent was in blue and underlined font. Skinner Decl. ¶¶ 17–18; *see Wu v. Uber Techs., Inc.*, 219 A.D.3d 1208, 1208–09 (1st Dep't 2023) (finding website user had inquiry notice of arbitration terms where the screen "included prominent hyperlinks to the terms in font commonly understood to signify hyperlinks"). The box directly adjacent to the documents was unchecked, and the registration screen was relatively uncluttered. *See Meyer*, 868 F.3d at 78 (finding arbitration agreement valid where the screen was uncluttered, the text and hyperlinks appeared directly below the buttons for registration, the hyperlinks were blue and underlined, and the button intended to manifest assent was directly adjacent to the notice of the terms); *Sollinger*, 2020 WL 774135, at *2 (holding user of SDC's website had inquiry notice of the arbitration agreement); *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 116–17 (2d Cir. 2025) (holding users of Grubhub's website had reasonable notice of arbitration provision where the terms appeared directly below the checkout button, the wording indicated users would be subject to the contractual terms, and the hyperlinks were spatially and temporally coupled with the checkout button). Accordingly, Plaintiff assented to the terms of the Arbitration Agreement when she registered as an SDC customer.[2]

### b. Plaintiff is Not Entitled to Additional Discovery.

Plaintiff argues she cannot adequately oppose Defendants' motion to compel arbitration without further discovery. Pl's. Opp'n at 14–15. Because Plaintiff voluntarily dismissed the

---

[2] Plaintiff's remaining argument on this point relates to Defendants' purported failure to provide informed consent about her dental treatment. *See* Pl.'s Opp'n at 16. That is irrelevant to whether Plaintiff agreed to arbitrate.

Complaint as to Defendant HFD, Plaintiff's alleged need for discovery related to HFD is moot. Plaintiff also contends she needs an affidavit from PSI or Dr. Guirguis, dental records and clinical notes related to her treatment, a list of dentists who "treated" her, and a list of employees who worked at SDC's Brooklyn and Staten Island offices. *Id.*; Pl.'s May 11, 2022, Letter ("Pl.'s Motion to Compel Discovery") at 3, ECF No. 13. Plaintiff's remaining requests for discovery fail.

On May 31, 2022, Magistrate Judge James R. Cho denied Plaintiff's motion to compel discovery. Minute Entry for Motion Hearing, dated May 31, 2022. This Court agrees Plaintiff has not identified discovery requests necessary to oppose Defendants' motion to compel. First, Plaintiff's requests for treatment records, clinical notes, and affidavits from Defendants PSI and Dr. Guirguis are unrelated to the instant motion to compel. The question before the Court is whether Plaintiff assented to the Arbitration Agreement, not whether Defendants provided negligent dental care or were properly licensed. Second, Plaintiff seeks "the names of the defendants' agents who had contact with [her]." Pl.'s Motion to Compel Discovery at 3. This inquiry could relate to Plaintiff's claim that SDC employees rushed her to sign the Informed Consent, thereby preventing her from reading the entire agreement. Pl.'s Decl. ¶ 7. Even so, Plaintiff does not need the names of SDC's employees to adequately oppose Defendants' motion. The Court has viewed the facts in the light most favorable to Plaintiff, finding her allegations could demonstrate she did not finish reading, and lacked actual knowledge of, the Arbitration Agreement. The names of the SDC employees who were working when Plaintiff visited the store—and even affidavits from those employees—would not bolster Plaintiff's argument as it relates to arbitration. Any other need for this discovery is merits-based. The Court denies Plaintiff's request to permit discovery before the Court decides Defendants' motion to compel.

### c. The Arbitrator Decides Whether the Entire Agreement is Valid.

"Challenges to the validity of arbitration agreements . . . can be divided into two types." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006). One type of challenge involves "the validity of the agreement to arbitrate." *Id.* "The other challenges the contract as a whole, either on a ground that directly affects the entire agreement . . . or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid." *Id.* "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 445–46. "[T]his arbitration law applies in state as well as federal courts." *Id.* at 446.

Plaintiff contends the entire Informed Consent is invalid because it is illegal. Pl.'s Opp'n at 15–19. Specifically, Plaintiff claims the agreement violates 8 N.Y.C.R.R. § 29.1(b)(10) by "design[ing] a scheme in which [SDC] 'dentists' performed no dental work, and instead, delegated all major dental responsibilities onto their non-dental staff." *Id.* at 15–16. Plaintiff's argument must be considered first by the arbitrator: it challenges the legality of the entire Informed Consent, not just the Arbitration Agreement contained therein. *See Buckeye Check Cashing, Inc.*, 546 U.S. 446 ("[B]ecause respondents challenge the Agreement, but not specifically its arbitration provisions . . . [t]he challenge should therefore be considered by an arbitrator, not a court.").

### II. The Arbitrator Determines Whether the Arbitration Agreement Encompasses Plaintiff's Claims.

If there is a valid agreement to arbitrate, courts must determine whether the dispute at issue falls within the scope of the arbitration agreement. *Alvarez v. Experian Information Sols., Inc.*, 661 F. Supp. 3d 18, 27 (E.D.N.Y. 2023) (Wicks, Mag.). "The scope of the arbitration agreement inquiry here concerns the question of arbitrability, *i.e.*, whether particular claims or

questions fall within the ambit of the arbitration clause." *Id.* Such questions "are presumptively for the court to decide except where 'there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator.'" *Id.* at 28 (quoting *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002)). The Second Circuit has "held that when, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005).

SDC's Arbitration Agreement makes clear the arbitrator—not the Court—decides the question of arbitrability. The Agreement states arbitration "shall be resolved using the rules of the American Arbitration Association." Def. Mem., Ex. 1, ECF No. 24-2. Commercial Rule 7(a) of the American Arbitration Association ("AAA") provides: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." *Commercial Arbitration Rules and Mediation Procedures*, American Arbitration Association, https://www.adr.org/commercial (2025). By incorporating the AAA's Rules into the Agreement, the parties have demonstrated their intent to have questions of arbitrability decided by the arbitrator. *See Sollinger*, 2020 WL 774135, at *3 (holding an arbitrator must determine whether the disputes were subject to arbitration, where the arbitration agreement incorporated the rules of the AAA); *Klein v. ATP Flight Sch., LLP*, 14-CV-1522, 2014 WL 3013294, at *10 (E.D.N.Y. July 3, 2014) (Bianco, J.) ("[T]he parties' incorporation of the AAA rules by reference in the arbitration clause is further evidence of their clear and unmistakable intent to delegate questions of arbitrability to arbitration."); *cf. Davitashvili*, 131 F.4th at 117–18 (finding the

11

question of arbitrability remains with the Court where the arbitration clause "clearly and unmistakably states that 'issues related to the scope, validity, and enforceability of this Arbitration Agreement are for a court to decide'"). Because the question of arbitrability is properly decided by the arbitrator, this Court declines to evaluate whether Plaintiff's claims fall within the scope of the Arbitration Agreement.

### III.     PSI and Dr. Guirguis Can Enforce the Arbitration Agreement.

Plaintiff contends the Arbitration Agreement does not apply to PSI and Dr. Guirguis because they were not signatories to the contract. The Arbitration Agreement provides, in part: "I hereby agree that any dispute regarding the products and services offered through SmileDirectClub and/or by *my affiliated dental professionals*, including, but not limited to medical malpractice disputes, will be resolved through final and binding arbitration." Def. Mem., Ex. 1 (emphasis added).

#### A. PSI and Dr. Guirguis Are "Affiliated Dental Professionals" under the Arbitration Agreement.

Plaintiff argues "[t]he only contractual language that would permit other entities to become part of the arbitration is if they could be classified as 'affiliated dental professionals.'" Pl.'s Opp'n at 18. Plaintiff further claims "[t]here is no detail or evidence about the relationship between Dr. Guirguis and Periodontal Specialists with Smile Direct and whether these parties were in fact 'affiliated dental professionals.'" *Id.* The Court disagrees. Justin Skinner, the Chief Technology Officer of Defendant SmileDirectClub, states in his deposition: "Dr. Guirguis is one of the doctors within SDC's network of affiliated dentists and orthodontists." Skinner Decl. ¶ 5. Dr. Guirguis, in turn, owns PSI. Compl. ¶ 29. The evidence therefore indicates PSI and Dr. Guirguis are "affiliated professionals" within the meaning of the Arbitration Agreement.

Plaintiff's contention that PSI and Dr. Guirguis never communicated with her directly does not defeat this conclusion. *See* Pl.'s Opp'n at 7. To the contrary, Plaintiff admits these Defendants "contracted with [SDC] to provide review, professional guidance and dental care to consumers who enrolled or contracted for [SDC's] direct to consumer clear aligners and orthodontics." Compl. ¶¶ 31–32. For the avoidance of doubt, however, the Court also addresses whether PSI and Dr. Guirguis can compel arbitration under an alternative theory.

### B. PSI and Dr. Guirguis Can Compel Arbitration Through Equitable Estoppel.

As aforementioned, Plaintiff claims PSI and Dr. Guirguis cannot compel arbitration because they "were not signatories to the arbitration agreement or waiver of jury trial." Pl.'s Opp'n at 18. But under the doctrine of equitable estoppel, "[s]ignatories to an arbitration agreement can be compelled to arbitrate their claims with a non-signatory where a careful review of the relationship among the parties, the contracts they signed . . . , and the issues that had arisen among them discloses that the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005) (internal quotation marks and citation omitted); *Ross v. Am. Exp. Co.*, 547 F.3d 137, 143 (2d Cir. 2008). If "the question of estoppel goes to the overall arbitrability of the dispute, it is for the Court to answer." *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 476 (S.D.N.Y. 2013) (Nathan, J.). "[D]istrict courts within this circuit have formulated a 'two-part intertwined-ness test, under which they examine whether: (1) the signatory's claims arise under the subject matter of the underlying agreement, and (2) whether there is a close relationship between the signatory and the non-signatory party.'" *Moss v. BMO Harris Bank, N.A.*, 24 F. Supp. 3d 281, 288–89 (E.D.N.Y. 2014) (Bianco, J.) (quoting *In re A2P SMS Antitrust Litig.*, 972 F. Supp. 2d at 476).

13

First, Plaintiff's claims against PSI and Dr. Guirguis are factually intertwined with the Informed Consent. Plaintiff seeks damages for (1) dental malpractice, (2) failure to obtain informed consent, and (3) failure to communicate significant findings. These claims concern the adequacy of PSI's and Dr. Guirguis's dental care and whether they properly informed Plaintiff of the treatment risks.[3] They directly implicate the Informed Consent, which PSI and Dr. Guirguis contend provided Plaintiff with adequate notice of treatment risks.

Second, a sufficiently close relationship exists between Plaintiff and the "non-signatory part[ies]" who seek to compel arbitration (*i.e.*, PSI and Dr. Guirguis). To satisfy this prong, "the relationship between the parties must either support the conclusion that the signatory effectively consented to extend its agreement to arbitrate to the nonsignatory, 'or, otherwise put, made it inequitable for the signatory to refuse to arbitrate on the ground that it had made no agreement with the non-signatory.'" *Doe v. Trump Corp.*, 6 F.4th 400, 413 (2d Cir. 2021) (quoting *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008)). Courts have extended equitable estoppel to situations where "a defendant, while a non-signatory to the [] contract containing an arbitration clause, was nevertheless explicitly named therein as having certain tasks to perform under that contract." *Ross*, 547 F.3d at 145. In contrast, where "the nonsignatory is alleged to be a third-party wrongdoer," courts "have made clear that the arbitration contract 'in no way' extends to the non-signatory." *Doe*, 6 F.4th at 413–14.

Pursuant to the Arbitration Agreement, Plaintiff agreed to arbitrate claims involving the products and services of SmileDirectClub and its affiliated dental professionals. The Informed Consent, which contains the Arbitration Agreement, explicitly references SDC's dental

---

[3] Plaintiff brought other claims as to Defendants SDC and HFD which are unrelated to the subject matter of the Informed Consent agreement. *See, e.g.*, Compl. ¶¶ 61, 69.

professionals. For example, Plaintiff agreed to use SDC's teledentistry platform "so a state-licensed dentist and I can engage in telehealth as part of my aligner therapy treatment." Defs.' Mem., Ex. 1. She confirmed her understanding "that 'telehealth' includes the practice of health or dental care delivery, diagnosis, consultation, treatment, and transfer of medical/dental information . . . between me and a state licensed dental professional who has engaged SmileDirectClub to provide certain non-clinical dental support organization services." *Id.* Because Plaintiff authorized telehealth treatment by a state licensed dental professional, it was foreseeable PSI and Dr. Guirguis would be included among SDC's "affiliated dental professionals." Accordingly, Plaintiff is estopped from avoiding arbitration with these defendants. *See Moss*, 24 F. Supp. 3d at 283–84, 289–90 (holding non-signatory defendants could compel arbitration because it was foreseeable that defendants "would be among the third parties with whom plaintiffs agreed to arbitrate" based on the language of the loan agreements); *id.* at 290 ("Having agreed to arbitrate with undefined agents and servicers, and likewise having agreed that agents and servicers could perform the ACH transactions, it would be inequitable for plaintiffs to avoid arbitration with those same agents and servicers."); *cf. Ross*, 547 F.3d at 146 (refusing to apply equitable estoppel where non-signatory "had no role in [the contracts'] formation or performance" and its "only relation with respect to the [] agreements was as a third party allegedly attempting to subvert the integrity of the [] agreements").

Where a court determines the claims at issue should be referred to arbitration, the Federal Arbitration Act directs the court to enter a stay "on application of one of the parties." *See* 9 U.S.C. § 3. And "[w]hen all claims have been referred to arbitration and a stay is requested, the Court *must* grant the stay." *Fadlelseed v. ABM Aviation JFK*, 751 F. Supp. 3d 207, 217 (E.D.N.Y. 2024) (DeArcy Hall, J.), *adopting report and recommendation.* Here, Defendants do

15

not request a stay; they ask the Court to dismiss the action entirely. Defs.' Mem. at 24. But Plaintiff does directly ask the Court to "stay this matter instead of dismissing the case, if the Court upholds the arbitration agreement." Pl.'s Opp'n at 22. Accordingly, the Court issues a stay pending resolution of the arbitration.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to compel arbitration is GRANTED. This proceeding is STAYED pending resolution of the arbitration.

SO ORDERED.

s/ WFK

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: May 16, 2025
Brooklyn, New York